The next case this morning is 2011-1555 TRANSOCEAN v. MAERSK. Mr. Walker, we'll begin with you whenever you're ready. Thank you. May it please the court, my name is Charles Walker for the appellant TRANSOCEAN. In this case, this court has already ruled on all the relevant questions of law in the first appeal in favor of TRANSOCEAN. The jury then decided in favor of TRANSOCEAN on all questions of fact. Despite that, the district court entered judgment for MAERSK, and in doing so ignored the mandate of this court and the role of the jury. This court should reverse the judgment again, primarily based upon the work it did in the first appeal. If we're looking at that, then we're looking exclusively at the secondary consideration, correct? That is correct. That is correct in that the simplest path to reversing the judgment is focusing on the secondary considerations. Okay, so why don't we go to the secondary considerations. Okay. It seems to me that your case concerning commercial success isn't that strong. And I say that because my experience with this particular factor is that you look at increases in market share, increases in revenue. So give me your best shot as to why you satisfy this commercial success. Certainly. There are indications of increased market share. The testimony of the expert, Mr. Braddock, testified how in the early days there were 13 rigs that were primarily TRANSOCEAN built rigs. But by 2008, about a third of the 99 rigs that were on order to be constructed were the dual activity rigs. In addition, you look to the commercial success by, for example, looking at the marketing of Maersk, in which in their advertisements for their rigs they primarily describe the rig floor, which include all the elements of the invention, as innovative. You also have examples of commercial success in this through the premiums paid by customers for the dual activity features. Mr. Braddock also testified about an example of two Anadarko contracts. They were signed on the same day for essentially the same type of contract terms for the same rig except one. That doesn't seem to me to really go to the commercial success problem, the fact that you have the contracts and they charge 12% more or 12,000 more or whatever for this one aspect and not the other. That doesn't seem to me a traditional kind of commercial success argument, right? Well, if you're looking at the traditional commercial success, we've seen through the testimony of Mr. Braddock that this idea of dual activity has increased its share in the marketplace over time. We also have testimony from Maersk's own marketing people that they went out to the marketplace and some of the customers demanded dual activity, which was part of the reason why they incorporated it into their design. Remember, they were building this rig on specification. They didn't have a customer yet and they needed to build a device that was going to be the most commercially attractive. Let me ask, are there cases in which we've said that secondary considerations trump a primitive case of obviousness? What's your best case for that where we've actually done that? There are in the most recent – if you look at the most recent case, the Mintz case from the last month or so, in which it describes how the focus isn't on the prima facie case. You have to look at all four grand factors in total. Let me refresh my recollection. Did we say that in light of a primitive case of obviousness, secondary considerations trumped in that case? In that case, they said you don't look at the prima facie case. That's the wrong analysis. What you're supposed to do is look at all – No, I'm not talking about the law. I'm talking about the practical matter. Have we found under a particular set of circumstances, secondary considerations trump a prima facie case of obviousness? In this case, in the first appeal, there was because there was a specific finding that there was a prima facie case of obviousness. Then in light of all the secondary factors, not just commercial success, the licensing, the copying, the praise in the industry, that that trumped the prima facie case of obviousness. As a matter of law, the district court could not hold the patent as obvious. We're now set in the same situation. Are you talking about our case? In this case, yes, in the first appeal. Okay, is that answer that you don't have another case of ours in which we actually concluded that in an instance where there's a prima facie case of obviousness, that secondary considerations trump that and led us to conclude that the patent was not obvious? I can't name a case right now, but I know that there are cases in which the court has ruled that because of the secondary considerations, when considering in light, you can't hold the patent as obvious. I don't believe that I can recite a case in which there's been a finding that a prima facie case of obviousness is found, and then secondary considerations trumped it. But as the court in Mintz recently indicated, that's procedural analysis that comes from the PTO. That's not appropriate for infringement analysis. You're supposed to look at all the factors together. And as the Supreme Court told us in Graham, the reason why you look at them all together, and you look at the secondary considerations, is to prevent the court from finding the invention, reading the invention, into the prior art. And that's what's happening in this case. When you look at a vacuum, if you look at horn and lung in a vacuum, you can, with the benefit of hindsight, find the elements, find a motivational way to combine them. But then, when you look at all the factors, when you look at the secondary considerations, that provides you with a new outlook at what horn and lung teaches. Is there any long-felt need here? What's the evidence with respect to long-felt need? The evidence of long-felt need was that there has always been a desire to increase the efficiencies of these rigs, even Lund states within its own text. Well, increasing the efficiency isn't enough, right? Correct. It's not a nexus to the patented invention. But we do have evidence that Lund was available and marketed as early as 1984 and 1985. Horn was available in the 1980s. We have deep water rigs being built throughout the late 80s and early 90s. Each of these are large projects in which the sufficiency to do better is always there. And despite that, no one combined all these elements into the invention. So we're talking about a 5-year or 10-year period? That's correct. Any evidence of tried and failed? Well, there's evidence that no one in the industry was building rigs for several years before Transocean built its first rig,  and the rigs, rebuilding rigs from 5, 10 years earlier would be too expensive to demand the day rates that were currently in operation. And the only way to build a new rig was to increase the efficiency. And that was the goal of the inventors, to increase the efficiency by 40%. And that was the task at hand. And they came up with this idea after looking at everything available in the art and realizing nothing got them there. They went ahead and came up with this idea. They enabled Transocean to build the first rig in a long period of time. Can I turn you to, just before we run out of time, to the question of damages? Yes. Can you explain to what evidence, I mean, you've got the $15 million. It seems to me you've got licenses that were done in connection with settlement of litigation, which might be problematic. Do you agree? Not in this case. In some cases they may be problematic when, for example, the amount paid is some portion of the nuisance cost of litigation. Here we have large, sophisticated companies agreeing to pay $10 million to $15 million up front, plus millions more per year. That's indicative of the value of the technology, not of any sort of discount based upon fear of litigation or nuisance costs. That's the reason why in some cases licenses can be the best evidence of damages. In this case, the licenses for significant amounts of money can't be discounted by some sort of litigation. Moreover, the question is whether there's substantial evidence to support the verdict, which is an analysis the district court didn't even undertake. There is a presumption of harm. Once you have infringement, there's a presumption of harm to the patentee and its right to exclude. And the only question is whether there's sufficient evidence. In this case, we have not only the licenses, but we have the testimony of the general counsel of Transocean, who said after getting together a team of advisors, their standard license was for $15 million up front and a 5% royalty in operation. Refresh my reflection. Wasn't that for a portfolio of patents of which the patents at issue were only two out of a large number? No. There are four dual activity patents. They are all based upon the same filing. They're all continuations of the same patent. All the licenses in this case are for those four continuation dual activity patents and no more. Just those four patents? Just those four. Okay, so we've got two out of the four. There are only two patents that are at issue here, right? So how do we know how to divvy up the amount? In this case, and I'm into my rebuttal, but I'll finish this up. In this case, the burden of proof or the burden of production was on Transocean. We came forward with these licenses. And so there is an inference that the value of the claims in this suit is the same as what's been part of this license. Otherwise, no license would ever be indicative of damages because no one ever sues on every claim in the licenses. In this case, it would have been then incumbent upon mayors to come forward with how the scope of the two claims in this case are somehow different in the value as opposed to the rest of the claims in the four related patents. Okay, we want to reserve the remainder of the rebuttal. Yes. And we'll hear from your friend on the other side, Mr. Frankel. Thank you, Your Honor. May it please the court. As the court has recognized, the remaining factual issue for consideration on remand was secondary considerations. And yet the district court's failure to instruct the jury on the fact that gram factors one through three had already been established ran afoul of this court's mandate and the law of the case. Are you suggesting that the jury shouldn't – they were asked to give an advisory verdict on obviousness itself. That is correct. It was an advisory verdict. Don't they have to consider the first three factors? We agree that the jury has to consider all the factors. Where we disagree is that Transocean had the right to come into the jury and argue that the scope and content of the prior art, the teachings of the prior art, the motivation that combined were contrary to what this court had already held in Transocean one. That was law of the case. Certainly the jury could be told, Warren discloses this, dual drilling. Lund discloses this, transfer of pipe. There's a motivation to combine that's already been established. But Transocean could come in, as they did, repeatedly to the jury, to the judge, and every five weeks to this court. So let's assume we agree that it was the law of the case. So we're not going to rely on the jury's verdict with regard to the primary case of obviousness. That still leaves you with the secondary considerations. Or is it your position that somehow allowing that to go to the jury harmfully infected the consideration, the secondary consideration? Well, Your Honor, we agree that secondary considerations was properly presented to the jury. But where we are concerned is that the jury did not have a sufficient foundation and understanding of the prior art in order to properly assess the nexus of the secondary considerations. The jury was obviously confused. They reached a verdict, Verdict 2, the answer to Special Interrogatory 2, which was entirely contrary to this court's holding. The jury concluded that Horne and Lund did not contain all of the elements of the claimed invention. Your concern with law of the case is laudable, but doesn't that put you sort of at odds with much of what Judge Hoyt did when you got to trial and afterwards? I would say that there was a continuing dialogue throughout trial as to how the court's decision of prima facie obviousness should be treated. Maersk advocated the view that the jury should be instructed that these factual findings and determinations had already been made, and certainly presented with them so they could factor them into the obviousness analysis along with the secondary considerations evidence. The problem was Judge Hoyt decided that he would let this go to the jury and he would deal with it afterwards as a matter of law, which is what he ultimately did. It did create some confusion along the way, I agree with that. But on the point about whether or not, let's assume we agree with you that he shouldn't have let it go to the jury and you're right about that. You still have to establish to us that that somehow, that the jury got it wrong. There was no substantial evidence to support secondary considerations. So is your position that there was just no evidence? Or is your position we can't even do the analysis because the evidence put forward with respect to obviousness somehow infected the consideration? No, that's not our argument. Okay, so let's return to the secondary considerations. There really are factors here that at least I personally don't recall seeing in other cases. In particular, the copying prong, which I don't recall seeing cases, and here there's pretty strong evidence in terms of the emails, in terms of copying. And there's several other things that are presented in this case in connection with secondary considerations that seem to be quite strong. So what's your best case? Let me address those. My best case, Your Honor, first of all, we do have a response on the sufficiency of the evidence of secondary considerations. And fundamentally, it is that there was a complete lack of any correspondence tying the secondary considerations to the patented claims combination. Remember, the claims combination here is combining dual drilling, which is already prior art, and all the advantages that came with that, and offline stand building, pipe transfer, which was already prior art, and all the advantages that came with that. The problem with the secondary considerations evidence is that none of it's tied to the advantages of combining those two things and any advantages that were not predictable uses of the prior art. Doesn't the industry praise that was in the record go precisely to that combination of those two pieces of prior art? The industry praise is very, very weak. The industry praise that's relied on... Well, let me ask you a question. Doesn't the industry praise, whether you think it's strong or weak, doesn't it go precisely to the motivation to combine those two prior art? It does not, Your Honor, because it doesn't speak to the combination that's claimed in the patent claims. The articles that were referred to in the record deal with dual drilling, which is horn, prior art. And there's a reference to dual activity in one of the articles, but what it describes is dual drilling. That's the offshore technologies article. So that evidence is, we think, very weak. To your point about copying, I'm not sure... Well, some of that evidence, doesn't it actually call out... I don't remember the name of their commercial embodiment. Can you help me out? The Discover Enterprise. Discover Enterprise. That's right. Star Trek should remember that. Yeah. Some of the evidence specifically points to their commercial embodiment, which is the commercial embodiment of the claimed invention. One of the articles does refer to the Discover Enterprise as a new dual activity drill ship, but again... No, no, not just refer to it as a dual activity drill ship, but also refer to it in a very laudatory and positive way. There's a short little blurb in an article called 50 Key Events that deals with a number of events in the drilling industry, such as a helicopter landing on a platform, such as an explosion on a rig, a whole bunch of things. And that particular reference, I think that you're referring to... 50 Key Events That Shaped the Offshore Industry. That's the little article that you're referring to. It sounds like the friggin', I don't know, genius prize for offshore drilling. I mean, I don't know how you're demeaning this article. This is the anniversary special edition of this magazine articulating which are the 50 best things that have occurred in offshore drilling in, by the way, the last 140 years or something. Especially, Your Honor... It's not like 50 last week, you know. If I can respond, Your Honor. It's not a Nobel Prize of offshore drilling here. It's not a Nobel Prize at all. It's 50 Key Events. It lists a number of paragraphs. And let's look at the one paragraph that mentions dual activity. It's on page A11597. It talks about, it's titled Dual Activity Drill Ship. It says, TransOcean's Drill Ship Discover Enterprise is the first ultra-deepwater drill ship with dual activity drilling technology to conduct drilling operations simultaneously rather than sequentially. That's dual drilling. That's horn. The aim is to reduce the time necessary for ultra-deepwater operations. That's horn. There's nothing new here. And this is just a summary of a bunch of events. It's certainly not a Nobel Prize for drill ships. And it's also emphasizing the fact that these drill ships are new. They're big. And they're able to go out in deep water. And that's not a characteristic of the patented invention either. I would like to address Your Honor's point about copying because I think you said something about emails and I'm not at all sure what you're referring to. The only copying evidence in this record, and copying evidence is not worthy of great probative value, particularly when it's here. The only thing that TransOcean pointed to, there's no replication of their product. They made a drill ship. We made a semi-submersible rig, which is something entirely different. The only copying evidence that was presented is a Marist internal memo. I'm sorry. I misspoke. That's not what I was referring to. It's talking about the competition and it says a good example of dual activity is the TransOcean Discover Enterprise. It also says size is a very big factor when you go into deep water. And there's a good example of that in the Deepwater Horizon and the Nautilus. And those are rigs that are not dual activity rigs. And we didn't copy those any more than we copied the Discover Enterprise. So, again, our submission to you is that this is very weak evidence and it's not key to the alleged invention, which is some combination of two pieces of prior art with very, very predictable results. If I can address the damages point that was made, I would like to touch on that briefly, because this is the first time I've heard that there's a presumption of harm when there's infringement. And I think it's the patentee's obligation burden to prove damages. And that just hasn't happened here. The case law is clear that you have to have an economic harm. No, for mock profits, you have to prove the amount that they were harmed. But the statute guarantees them no less than a reasonable royalty. Why aren't they entitled to that in this case? Because that reasonable royalty is for, in part, for use of the invention, as the statute reads. And there's been no use of the invention here. And the other point is that that reasonable royalty requirement doesn't excuse the patentee from establishing some economic harm. That's the Rescue Net case, that's the Supreme Court case in Arrow in the 1960s. That's the law of the land. You can't just get a reasonable royalty automatically, especially for... Well, they have these licensing agreements. They had some evidence to show what the market was providing with respect to their invention. That's true. And as you yourself noted, Your Honor, those licenses were worldwide licenses for patents that included apparatus claims, which is all that's in dispute here, method claims, which dealt with the whole operation of using these rigs and drilling with them. So perhaps the question is only whose burden was it to demonstrate the portion of this license fee that was attributable to these patents as opposed to the others? Right. We agree that they have the right to rely on that as evidence. We just think, again, it's very weak evidence. It wasn't probative, and it wasn't sufficient. And that's our contention, that it wasn't commensurate with the scope of the patents. Well, if there are four patents and that draws $15 million plus $5 million down the road or whatever, then some... You're saying that it was their burden to... They get nothing unless they demonstrate what portion of that $15 million was attributable to the two patents at issue? We're not saying nothing. We're saying they had to prove two things. They had to prove they were damaged. Now, remember, the whole infringement theory in this case is an infringement by contract theory. It's the contract that's the alleged act of infringement. Allegedly, we offered a rig that was never delivered. So there's been no use of an infringing product, and Transocean is claiming they're entitled to $15 million for that. And they based that on the upfront fee in a series of licenses that they offered to other people who were willing to take those licenses to avoid litigation and to have worldwide rights under four patents that included apparatus claims and method claims. It was Transocean's burden to show, number one, that it was damaged, and number two, it was their burden to apportion the damages such that they were commensurate with the alleged act of infringement, the offer for sale in a contract. And we don't think that they did that, and we think Judge Hoyt was entirely right in ruling that the evidence was insufficient in that regard. So that's our position on damages. I'd like to briefly address the infringement question, if I could. It's your time. Thank you, Your Honor. This is an infringement by contract theory. That's the question that was ultimately put to the jury. The jury was asked, did Maersk infringe when it entered into a drilling services contract? And we feel very strongly it's an argument that we've made to this court before. Yeah, and therefore it raises the question about whether or not it's already law of the cave. Yeah, and I'd like to address that because I don't want it coming back at me in rebuttal. The issue here is, the issue that was before the court before was an issue of extraterritorial aspects of a contract and whether that could result in infringement within the United States. It was the extraterritorial issue that was addressed in the prior opinion. Didn't the prior opinion say it was contract for sale? The prior opinion did include a statement, Your Honor, that said there's no dispute that there's a sale here, and it went on to deal with the extraterritorial issue. We did very much dispute that, and we brought that to the court's attention numerous times, including in a position for a hearing, which the court received briefs on. And so that's a position we've always maintained as a matter of law, that Maersk no more sold a rig to Statoil than United Airlines sold me an airplane when I purchased a ticket for transportation to this hearing. Judge Wallace alluded to, I think, the question before us is not whether you're right or wrong in that regard, but whether or not it's fairly discerned as law of the case. And so you say it's not law of the case? Why did you do a petition for a hearing unless you thought that that's what it said and you were disputing what it said? We sought to clarify the point and preserve the argument, but I must say it's not law of the case because it wasn't essential to the court's rulings, which again went to the extraterritorial issue. So we don't believe it was law of the case at all. Do you believe that something's not law of the case if it's not essential to the court's ruling? I don't want to misstate the exact test, but certainly it's only law of the case if it's discussed in the court's decision and forms a fundamental part of that decision and was necessary to decide. I don't believe I am, Your Honor. Law of the case says that there were facts that were decided and they should be respected in the lower court, that this court has already decided the prima facie grant factors. It shouldn't be revisited. Yes, we believe the court was free to disregard that issue. That was a live issue that we presented as a matter of law before trial on summary judgment. The court reserved decision on that and ultimately dealt with it in the decision on the J-law. Okay. We have your argument. Thank you. Thank you, Your Honor. We'll rely on our producer for any other questions. Thank you. Thank you, Your Honor. On the issue of validity, it's really not an issue of whether one secondary consideration had substantial evidence. The question is whether there's substantial evidence for enough of them to show that you cannot, as a matter of law, find this patent obvious, which the court already concluded in the first case. But even if there's substantial evidence for all of them, somebody has to weigh them against the strength of the prima facie case, right? Correct. So the jury found that, yeah, you proved commercial success tended to favor non-obviousness. Well, but how about on a scale of 1 to 10? Did it tend to favor non-obviousness a little bit, or did it tend to favor non-obviousness a whole heck of a lot? And then you have to figure that out, which, of course, we don't have that degree of guidance from the jury. Correct. We just have, yes, it favored it, binary. Correct. And so then you have to figure out how much each of those factors contribute, and are they enough to overcome the prima facie case that was created? You're correct. You've identified one of the problems in this factual analysis, and then jumping to a legal conclusion, is that we do not have from the jury whether they rated it a 1 to 10 on the scale. What we have to assume, though, when reviewing for substantial evidence, is that they found it to a 10. Why? Because we look at it like most favorable to transocean. No, the fact-finding is clear. The fact-finding is, does commercial success support non-obviousness? Yes. Why do I look at that discrete fact-finding as offering some degree of the support that it proffers? Well, this court has already looked at that in the first case on a lesser record and concluded that the evidence presented in the summary judgment was more than enough to state that as a matter of law, you could not find the patent obvious. And so now, as we come from this trial, we not only have the evidence that was presented on summary judgment, but additional testimony from the inventors, additional testimony from experts, additional documents, which all tend to support the secondary consideration of non-obviousness. You can reevaluate, but unless there is some sort of new prior art or substantively new evidence that weighs towards obviousness, this court cannot come to a new conclusion. It's already looked at these facts and decided that you can't treat this patent as obvious because of these… Without considering the secondary considerations. I don't understand what you're saying. We essentially said, send the secondary considerations to the jury, and if they say yes, case over, the law of the case, that it's non-obvious, patent is non-obvious? Effectively, that was what was done because what was said is that we have to look at these findings of fact. It wasn't just that the district court ignored the secondary considerations in the summary judgment, which it did. But this court said that even assuming that you look at the secondary considerations, there's enough questions of fact there that it resolved in Transocean's favor, which they did in the summary judgment and which we must now do at this point. But that, which you recognized by your answer a minute ago, was it's a different record. The record differs between what was presented or proffered as going to be proved during summary judgment and what was actually proffered at trial. So somebody has to do an analysis of all four Graham factors cumulatively. Maybe they can't review whether or not Horn and Lund disclosed individual elements because that was already discussed, decided as law of the case. But somebody's got to weigh all of this stuff together and discern whether or not you proved enough to overcome a prima facie case. I mean, don't you think it's possible that your evidence could have come in much weaker than what you proffered, and as such, it wouldn't overcome the prima facie case, even if the jury concluded, yes, you did prove a smidgen of commercial success? It's possible, but not in this case. Okay. Because the documents we had on summary judgment came in at trial. We had additional testimony of the inventors and the experts that provided additional testimony on that. But just on... You're saying what you came up with was actually stronger than what you proffered. Correct. In this record, you can't. That's right. Maybe there's a case where that could happen, but this is not it. And in response, there isn't additional evidence from Maersk on most of these points. I wanted to ask you one quick question and cut you off. Just because, and I forgot to ask it to the red brief folks, so they argued marking wasn't decided below, and that would be a separate reason to JMAW the entire damages verdict. And you didn't respond to that in your gray brief, as best as I can tell. I went back and pulled all of the JMAW motions for both sides, because their JMAW motions were in the appendices, but yours weren't, which would help me a little bit. But yours weren't there, and they gave the reasons why you said JMAW is not appropriate. I guess what do we do with this? They said, their brief has two sentences on it. This is a question of fact for which remit is necessary. And my first instinct was, gosh, it's a question of fact, and the jury already decided when they came up with the damages award. And my second thought was, in your JMAW, you point to trial testimony where notice was disclosed to them. So, I don't know. Do you want to tell me what, if anything, do you think remit is necessary in light of this? No. There was notice given, and it's in the record at 10718-19. It was a letter from Transocean to Marist. It identified a number of patents, both U.S. and foreign patents, that were all related to this dual activity. Was this letter presented to the jury? Yes, it was, admitted into evidence, and discussed. In fact, Marist knew about these patents before it received the letters. Was there an argument at trial? Was that a curiosity over marking, and whether or not there was marking, or whether there was actual notice given, or any of those sorts of things? No. Was the jury given any instructions? No, the jury was not given any instructions. Was there any point of objection to the failure to instruct the jury on any of those points? No. No, there wasn't. And with the finding of infringement, the finding of damages, it was Marist's obligation, if there was an additional question of fact, delaying the notice, they should have brought that forward. We put forth the evidence of the notice letter, which is more than sufficient, and looking in a light of us favorable with Transocean, was more than sufficient notice for the statute. Okay. Time concluded. Thank the counsel. The case is admitted.